IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RENE PASCUAL MUNOZ, | ) | No. C 04-1000 MMC (PR) |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; DISMISSING UNSERVED DEFENDANT** |
| JOE McGRATH, Warden; CALVIN TERHUNE, Director, | ) ) ) | |
| | ) | (Docket No. 20) |
| Defendants. | ) ) | |
| _____ | ) | |

On March 11, 2004, plaintiff, a California prisoner currently incarcerated at Pelican Bay State Prison ("PBSP") and proceeding pro se, filed the above-titled civil rights complaint pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff seeks monetary damages based on the allegation that Joe McGrath ("McGrath"), the PBSP Warden, and Calvin Terhune ("Terhune"), the former Director of the California Department of Corrections ("CDC"), placed him and the other inmates at PBSP "lock-down" in groups separated by race and ethnicity. On May 19, 2004, the Court found such allegation, liberally construed, states a cognizable claim under the Equal Protection Clause, and ordered the complaint served upon McGrath. Now before the Court is McGrath's motion for summary judgment. Plaintiff has

filed an opposition, to which McGrath has filed a reply.[1]

**FACTUAL BACKGROUND**[2]

Plaintiff, a Southern Hispanic[3] inmate, has been incarcerated at PBSP since 1997. Beginning on April 15, 1999, plaintiff was housed in general population. On October 14, 1999, a state of emergency was declared at PBSP due to continuing gang-related violence between inmates. Following that declaration, groups of inmates organized by their race and ethnicity were intermittently placed on "lock-down" status, during which their normal privileges, including yard access, were limited. The groupings of inmates included Southern Hispanic, Black, White, "Border Brother,"[4] and "Other." (Smith Decl. ¶ 7.)

PBSP Associate Warden Paul Smith ("Smith") attests that the rationale for this practice was that it would reduce violence caused by gangs organized by race and ethnicity,[5] and protect the safety of inmates, staff and the institution. (Smith Decl. ¶¶ 2, 4, 8.) Smith further explains that yard access affords the greatest opportunity for physical contact, spontaneous altercations and planned incidents of retribution between inmates, and that placing them on lock-down status is the best way to physically separate them from each another. (Id. at ¶ 3.) According to Smith, because the violent disturbances leading to the state of emergency derived from the animosity existing between the different racial and ethnic gangs at the prison, the inmates were locked down in groups according to their race

---

[1] Terhune was not served and does not join in the present motion. The claims against him are discussed infra.

[2] Except where otherwise noted, the facts set forth in the background section are not disputed by the parties.

[3] "Southern Hispanic" refers to Hispanic inmates from southern California.

[4] "Border Brother" refers to Hispanics who are foreign nationals.

[5] Although the parties do not describe the different gangs in detail, in a recent case involving California's practice of segregating new inmates by race in order to prevent gang violence, the United States Supreme Court identified the following five gangs in the California prison system: "Mexican Mafia, Nuestra Familia, Black Guerilla Family, Aryan Brotherhood, and Nazi Low Riders." Johnson v. California, 543 U.S. 499, 502 (2005). Plaintiff was ultimately identified as a member of the Mexican Mafia, the gang comprised of Southern Hispanic inmates. (Cattermole Decl., Exs. C-E.)

2

and ethnicity. (Id. at ¶ 4.)

Following the declaration of the state of emergency, prison officials began identifying individual inmates who were believed to be unlikely to cause violence, and returned them to normal privileges, including yard access. On February 23, 2000, however, a riot occurred at PBSP involving approximately 300 Southern Hispanic and Black inmates. Ninety-four inmates sustained stabbing or slashing-type wounds, and 25 inmates were transported to a hospital outside the prison for treatment. Following the riot, all the inmates in the general population, including plaintiff, were immediately returned to lock-down status. During the ensuing months, inmates were again returned to normal activities, such as educational programs, jobs, canteen, and the telephone; they also were given yard access, but on a rotating basis and in groups separated by race and ethnicity.

Thereafter, due to continuing incidents of violence between the gangs, prison officials reinstated the lock-down of inmates separated by racial and ethnic group. As incidents of gang violence occurred, the specific racial or ethnic group of inmates corresponding to the gang involved would be returned to lock-down status; when there was more widespread violence, the entire general population would be placed on lock-down status. At least three separate violent incidents involving Southern Hispanic inmates occurred in May 2000, and Southern Hispanic inmates were placed on lock-down status between May 11 and June 20, 2000, and, again on August 18, 2000, due to further instances of gang-related violence involving Sourthern Hispanic inmates. During their periods of lock-down, the inmates were allowed some access to activities outside of their cells, including the law library, showers, classification committee hearings, medical, dental and psychiatric appointments, "no-contact" visits,[6] and weekly yard access.

On September 8, 2000, while the Southern Hispanic inmates in general population were on lock-down status, plaintiff was moved from the general population to administrative segregation, based on his possession of a manufactured weapon. He returned to the general

---

[6] A "no-contact" visit is a visit conducted through a glass barrier rather than in an open visiting room. (Smith Decl. ¶ 10.)

3

1 population (and lock-down status) on November 22, 2000.  In January 2001, McGrath
2 implemented a policy to release from lock-down individual inmates who appeared willing to
3 refrain from gang activities.  This process involved interviewing each inmate and reviewing
4 his past prison activities to determine his affiliation with a gang and the likelihood that he
5 would engage in violence.  On November 30, 2001, plaintiff was returned to administrative
6 segregation based on a determination that he had links to the Mexican Mafia prison gang.  In
7 April 2002, after further investigation of plaintiff, officials "validated" him as a member of
8 the Mexican Mafia and moved him from administrative segregation to the Security Housing
9 Unit ("SHU").

10 The placement of inmates on lock-down status described above was the subject of
11 litigation in the California state courts.  Plaintiff attaches to his complaint a December 2002
12 decision in a state habeas case, Escalera v. McGrath, No. HCPB 00-5164, in which the
13 superior court found PBSP's separation of inmates by race and ethnicity for the purpose of
14 lock-downs to be "constitutionally impermissible," and granted the petitioner injunctive
15 relief.  (Complaint, Ex. C.)[7]  Plaintiff states in his complaint that he filed a habeas petition in
16 superior court that was a "companion" to Escalera; he does not, however, attach any records
17 from that case or describe its outcome.  Unlike the state court habeas cases referenced by
18 plaintiff, in which the petitioner sought only injunctive relief, plaintiff herein seeks monetary
19 damages.[8]

---

[7] Although plaintiff alleges in his complaint that the decision subsequently was affirmed by the state court of appeal, neither party cites or submits that opinion herein.

[8] Neither party argues the state court actions referenced by plaintiff have any bearing on plaintiff's instant claims under the doctrines of res judicata or collateral estoppel, nor does there appear in the record before the Court a basis for applying such doctrines herein.  First, as noted, neither party has provided any record or decision with respect to plaintiff's state habeas petition.  In any event, res judicata does not bar plaintiff's claims for damages, as his prior habeas action sought equitable relief.  See Hiser v. Franklin, 94 F.3d 1287, 1292 (9th Cir. 1996) (holding res judicata does not bar claims for damages based on prior claims for equitable relief).  Second, with respect to the Escalera case, such decision does not bar plaintiff's claims as plaintiff was not a party or in privity with a party to that action.  See Montana v. United States, 440 U.S. 147, 153 (1979) (holding res judicata bars relitigation of claims by same parties or persons in privity therewith).  Further, because Escalera did not address the issue of qualified immunity, on which the present order, as discussed infra, is

4

**DISCUSSION**

A.   Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that

---

based, Escalera is not controlling herein.  See Hiser, 94 F.3d at 1292 (holding collateral estoppel only bars relitigation of issues explicitly litigated and necessary to prior judgment).

fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

B.  Analysis

McGrath argues, inter alia, he is entitled to qualified immunity on plaintiff's claim that placing plaintiff on lock-down status based on his Southern Hispanic ethnicity following the February 2000 riot violates the Equal Protection Clause. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A ruling on the issue of qualified immunity should be made prior to trial, such that the costs and expenses of trial are avoided where the defense is dispositive. Saucier v. Katz, 533 U.S. 194, 200 (2001). Qualified immunity is particularly amenable to adjudication by summary judgment. Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004).

At the outset, the Court addresses the matter of the time period in which plaintiff was subjected to lock-downs at PBSP. In his complaint, plaintiff alleges he was subjected to a lock-down between February 2000 and the "present day," i.e. March 11, 2004, the date he signed the complaint. McGrath, however, has submitted evidence, consisting of plaintiff's prison records, showing plaintiff was not subjected to any lock-down between September 8 and November 22, 2000, or after November 30, 2001, because during those periods plaintiff had been moved from the general population, where the lock-downs were in effect, to administrative segregation and, eventually, the SHU. (Cattermole Decl., Exs. C-E.)[9] In his opposition, plaintiff does not dispute this evidence, nor does he contend he was in fact subjected to a lock-down between September 8 and November 22, 2000 or after November 30, 2001. Accordingly, the undisputed facts demonstrate plaintiff was subjected

---

[9] Plaintiff does not claim, and there is no evidence showing, impermissible segregation of inmates took place in either administrative segregation or the SHU.

to a lock-down between February 2000 and September 8, 2000, and again between November 22, 2000 and November 20, 2001. The Court now turns to the question of whether McGrath is entitled to qualified immunity with respect to the lock-downs enforced during those periods.

A court considering a claim of qualified immunity first determines whether the plaintiff has alleged the deprivation of an actual constitutional right, and then determines whether that right was "clearly established." Wilson v. Layne, 526 U. S. 603 (1999); Conn v. Gabbert, 526 U.S. 286, 290 (1999). The initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the state official's conduct violated a constitutional right. Saucier, 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. On the other hand, if a violation could be made out on the allegations, the court next asks whether the right was "clearly established." Id. Accordingly, for purposes of the instant action, the initial determination is whether, under the facts as viewed in a light most favorable to plaintiff, the lock-down of plaintiff based on his Southern Hispanic ethnicity was unconstitutional.

Invidious racial discrimination such as racial segregation, which is unconstitutional outside of prison, also is unconstitutional within a prison. Johnson v. California, 543 U.S. 499, 511-12 (2005).[10] A prison classification based on race is immediately suspect and is subject to the same "strict scrutiny" as a racial classification made outside of prison. See id. at 509-10, 515. Prison officials thus must demonstrate that the race-based policy or action is "narrowly tailored" to serve a compelling state interest. Id. at 515. Here, even if the Court assumes, arguendo, and with the facts viewed in a light most favorable to plaintiff, that placing groups of inmates, including plaintiff, on lock-down status based on their race or

---

[10]Although this Court views the alleged discrimination against Southern Hispanic inmates to be based on their ethnicity, as opposed to their "race," the United States Supreme Court has treated such discrimination as equivalent to "racial" discrimination for purposes of equal protection analysis. See Johnson, 543 U.S. 502-09 (discussing whether segregated housing of Southern Hispanic inmates, as well as inmates of other racial and ethnic groups, violates the Equal Protection Clause).

7

ethnicity was not narrowly tailored to serve a compelling state interest, however, McGrath nonetheless is entitled to qualified immunity because the constitutional right was not "clearly established" at the time plaintiff was subjected to such lock-downs.

"The relevant, dispositive inquiry in determining whether a right is clearly established for purposes of qualified immunity is whether it would be clear to a reasonable state official that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. If the law did not put the official on notice "that his conduct would be clearly unlawful," the official is entitled to qualified immunity. See id. In the instant case, PBSP argues that, in the period from February 2000 to November 2001, it would not have been clear to a reasonable prison official that locking down inmates based on their race and ethnicity in order to prevent continued gang violence at PBSP was unconstitutional. At that time, race-based classifications of inmates were subject to a more lenient standard than the strict scrutiny standard announced in Johnson in 2005. Prior to Johnson, a prison regulation segregating inmates on the basis of their race or ethnicity only had to be "reasonably related to legitimate penological interests." See Turner v. Safley, 482 U.S. 78, 89 (1987); see also Johnson v. California, 321 F.3d 791, 799 (9th Cir. 2003), overruled by Johnson v. California, 543 U.S. 499, 530-31 (2005) (finding Turner standard does not apply to racial classifications in prison). Consequently, PBSP is entitled to summary judgment on the "clearly established" prong of the qualified immunity analysis unless it would have been clear to a reasonable prison official, under the undisputed circumstances existing at PBSP between February 2000 and November 2001, that locking down PBSP inmates, including plaintiff, in groups separated by race and ethnicity was not reasonably related to a legitimate penological interest.

In that regard, the evidence is undisputed that the following circumstances surrounded the lock-down of inmates at PBSP between February 2000 and November 2001: There are gangs in the California prisons, and at PBSP in particular, which gangs are formed on the basis of the race and ethnicity of the inmates. These gangs have a history of violent clashes and riots in the prisons, which history includes a number of violent incidents between rival

gangs at PBSP that necessitated the declaration of a state of emergency at the prison in October 1999.[11] In February 2000, a large-scale riot took place at PBSP place between Southern Hispanic and Black gangs in which 94 inmates were injured and 25 were hospitalized. Following this riot, PBSP officials locked down inmates in groups separated by race and ethnicity, including a group of Southern Hispanic inmates that included plaintiff, in order to physically separate them from each other, particularly in the prison yard, and thereby minimize the opportunities for further violence between the inmates. In the ensuing months, prison officials began to release these groups of inmates from lock-down, but returned them to lock-down status when further incidents of gang-related violence persisted. The Southern Hispanic inmates were locked down between May 11 and June 20, 2000, and again as of August 18, 2000, after Southern Hispanic gangs were involved in further violent incidents. In January 2001, PBSP nonetheless implemented a policy that abolished racially segregated housing at PBSP, under which the lock-down of Southern Hispanic inmates would be lifted and inmates would be evaluated on an individual basis for a determination of their security risk. Pursuant to this policy, plaintiff, in November 2001, was moved from the lock-down of the general population to administrative segregation, and eventually the SHU, based on a determination by prison officials that he was a member of the Mexican Mafia gang.

       Plaintiff cites no case indicating that in 2000 and 2001 it was "clearly established" that, under the undisputed facts set forth above, segregating inmates based on their race or ethnicity in order to prevent violence was unconstitutional. Plaintiff bears the burden of proving the existence of a "clearly established" right at the time of the allegedly impermissible conduct. See Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992). In its 2003 decision in Johnson, the Ninth Circuit surveyed the federal law then in existence with respect to whether prison officials could separate inmates by race in order to

---

[11]Although the parties do not present evidence regarding the Mexican Mafia, the Southern Hispanic gang to which prison officials later tied plaintiff, the Court notes the state court in Escalera described the gang, known as either the "Mexican Mafia" or "Eme," as "the most dangerous and powerful" of the prison gangs at PBSP, and that it "would be difficult to overstate the power of the Eme" in intimidating Southern Hispanic inmates into joining the gang. (Complaint, Ex. C at 5-6.)

prevent violence between them, and identified the two Supreme Court decisions that had discussed the issue: Lee v. Washington, 390 U.S. 333 (1968), and Cruz v. Beto, 405 U.S. 319 (1972). See Johnson, 321 F.3d at 796-98.[12] In Lee, the Supreme Court had found unconstitutional an Alabama state law providing for racially-segregated prisons, but a three-judge concurrence recognized that "prison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails." See Lee, 390 U.S. at 334. Thereafter, in Cruz, the Supreme Court held that "racial segregation" in prisons is unconstitutional "save for 'the necessities of prison security and discipline.'" See Cruz, 405 U.S. at 321 (quoting Lee, 390 U.S. at 334). Based on this precedent, the Ninth Circuit concluded that while "racial discrimination" in prisons is unconstitutional, "the use of race-based criteria in official decision-making" is permissible "under limited circumstances." Johnson, 321 F.3d at 797. The Ninth Circuit pointed out, however, that it is far from clear just what those limited circumstances are. In particular, the Ninth Circuit observed, "[t]he 'particularized circumstances' or 'necessities of prison security and discipline' under which racial discrimination is permissible have never been defined by the Supreme Court or this court, and the meaning of these terms is not axiomatic." Johnson, 321 F.3d at 797.

Because the Supreme Court and the Ninth Circuit had "never," as of 2003, defined the circumstances under which racial segregation could be used to stem gang violence in the prisons, it would not have been "clear" to a reasonable prison official in 2000 and 2001 that doing so was unconstitutional, and particularly following a large-scale gang riot and later persistent instances of gang-related violence among inmates. Cf. Richmond v. J.A. Croson, 488 U.S. 469, 488 (1988) (Scalia, J., concurring) (citing Lee for proposition that "only a

---

[12] The Supreme Court's decision overruling the Ninth Circuit did not disagree with the Ninth Circuit's identification of existing precedent as to segregating inmates for security reasons, but rather found such precedent did not preclude the application of strict scrutiny to racial segregation in prisons. See Johnson, 543 U.S. at 505-14. The Court discusses in greater detail infra why the Supreme Court's decision in Johnson does not alter the instant analysis of whether the law was "clearly established" for purposes of qualified immunity analysis.

10

social emergency rising to the level of imminent danger to life and limb – for example, a prison race riot, requiring temporary segregation of inmates – can justify an exception to the principle embodied in the Fourteenth Amendment that our Constitution is color-blind") (internal quotation and citation omitted).  Moreover, the Ninth Circuit, in Johnson, found the practice of segregating newly-arriving inmates by race in order to prevent gang-related violence in the California prisons to be constitutional.  Johnson, 321 F.3d at 799-807.  If the Ninth Circuit, in 2003, could find it was constitutional to segregate inmates in the California prisons in order to prevent gang violence, then it can hardly be said that it would have been "clear" to a reasonable state official, more than two years earlier, that it was unconstitutional to do so.

The Supreme Court's subsequent reversal of the Ninth Circuit's decision in Johnson does not alter this analysis.  To begin with, as noted, the Supreme Court's decision was issued in 2005, substantially later than the lock-downs in 2000 and 2001 at issue herein.  Moreover, the Supreme Court only found the Ninth Circuit had failed to apply the correct standard, strict scrutiny; it did not find California's use of such classifications in order to prevent gang violence to be unconstitutional.  Johnson, 543 U.S. at 514-15 ("Strict scrutiny does not preclude the ability of prison officials to address the compelling interest in prison safety.").  Nor does the Supreme Court's decision in Johnson rely on any precedent establishing that segregating inmates in order to prevent gang-related violence in the prisons is unconstitutional.  See id. at 505-14.  Consequently, the Supreme Court's decision in Johnson did not "clearly establish" that the segregation of California inmates on lock-down status in order to prevent gang violence, given the circumstances existing at PBSP, is unconstitutional, much less that such was the state of the law in 2000 and 2001.

In sum, in 2000 and 2001, a reasonable prison official could have believed that under some circumstances, he could, without offending the Constitution, segregate inmates by race and ethnicity in order to protect the safety and security of the prison.  Even if plaintiff could establish that, under current law, PBSP's lock-down practices in 2000 and 2001 was unconstitutional, it was not clearly established at that time that prison officials could not

11

lock-down inmates in groups separated by race and ethnicity in order to reduce the widespread gang violence then occurring at PBSP.  Consequently, McGrath is entitled to qualified immunity with respect to plaintiff's claims.  This is not to say that prison officials may now, or in the future segregate inmates by race or ethnicity without offending the Constitution.  The Court's decision herein is only that, under the doctrine of qualified immunity, plaintiff is not entitled to receive damages for such practice under the circumstances existing at PBSP over five years ago, when the legal landscape was substantially different, and murkier, than it is today.

C.  Unserved Defendant

As noted, plaintiff names, as an additional defendant, Terhune, the former CDC Director.  In that regard, the complaint includes no allegations specific to either defendant; it simply alleges that the lock-downs took place and lists McGrath and Terhune as defendants.  There is no suggestion in the complaint, the exhibits attached thereto, or in the briefs and exhibits filed in connection with the present motion, that the analysis differs with respect to Terhune as opposed to McGrath.

As discussed above, it was not "clearly established" that the lock-downs of inmates at PBSP in 2000 and 2001 were unconstitutional, and thus any state official responsible for those lock-downs, irrespective of his/her title, is entitled to qualified immunity.  Accordingly, the Court will grant summary judgment in favor of Terhune.  See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 803 (9th Cir. 1995) (affirming district court's granting summary judgment in favor of nonappearing defendant, where plaintiff, in response to motion filed by defendant who had appeared, had "full and fair opportunity to brief and present evidence" on dispositive issue as to claim against nonappearing defendant).

///
///
///
///
///

**CONCLUSION**

For the reasons stated, defendant McGrath's motion for summary judgment is hereby GRANTED and judgment in favor of both defendant McGrath and defendant Terhune shall be entered.

This order terminates Docket No. 20.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: March 9, 2007

MAXINE M. CHESNEY
United States District Judge